**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JANE DOE, *et al.*,<br><br>       *Plaintiff,*<br><br>   v.<br><br>OFFICE OF PERSONNEL<br>MANAGEMENT,<br><br>       *Defendant.* | Civil Action No. 25-234 (RDM) |

## MEMORANDUM OPINION AND ORDER

On December 22, 2025, the Court granted Defendant Office of Personnel Management's ("OPM") motion to dismiss for lack of jurisdiction, *Doe v. OPM*, 813 F. Supp. 3d 156 (D.D.C. 2025) ("*Doe II*"), and, consistent with Federal Rule of Civil Procedure 12(h)(3), the Court dismissed the action and entered final judgment on January 15, 2026, *see* Dkt. 46.  Forty-four days later, on February 28, 2026, Plaintiffs filed the pending motion for relief from judgment under Federal Rule of Civil Procedure 60(b)(2), seeking leave to file a second amended complaint including additional jurisdictional allegations, and requesting that the Court "amend [its] Memorandum Opinion to the extent that it denied Plaintiffs' Motion for Class Certification as moot."  Dkt. 49 at 2.  For the following reasons, the Court will **DENY** Plaintiffs' motion.

### I.  BACKGROUND

The Court has described the background of this case on two prior occasions, *see Doe v. OPM*, No. 25-cv-234, 2025 WL 513268, at *2–4 (D.D.C. Feb. 17, 2025) ("*Doe I*"); *Doe II*, 813 F. Supp. 3d at 164–67, and will repeat only the background necessary to decide the pending motion.  In January 2025, the OPM began implementing a new "Government-Wide Email

System" ("GWES"), which was designed to "send important communications to ALL civilian federal employees from a single email address," HR@opm.gov.  Dkt. 14 at 4–5 (Am. Compl. ¶¶ 20–21).  "[The] OPM sent several email messages to large swaths of the executive branch workforce, and, perhaps inadvertently, to a host of others, including (apparently) members and staff of the federal judiciary, *id.* at [5] (Am. Compl. ¶¶ 22–24), government contractors, state employees with '.gov' email addresses, and employees of agencies in the legislative branch, such as the Library of Congress, *id.* at 2, 5 (Am. Compl. ¶¶ 7–9, 23)."  *Doe II*, 813 F. Supp. 3d at 166.

Plaintiffs, two federal executive branch employees and five other individuals who use ".gov" email addresses but are not executive branch employees, Dkt. 14 at 1–2 (Am. Compl. ¶¶ 3–9), filed an amended complaint on February 7, 2025, alleging that the OPM's GWES was adopted and implemented in a manner that violated Section 208 of the E-Government Act, *see id.* at 9–12 (Am. Compl. ¶¶ 43–61).  Specifically, Plaintiffs alleged that the OPM failed to prepare and to publish a legally sufficient Privacy Impact Assessment ("PIA") before collecting what Plaintiffs characterize as their Personally Identifiable Information ("PII")—that is, their government email addresses, which may reveal their full names—through the GWES.  *Id.* Instead, the OPM published a first, and then a second, PIA after the GWES was fully operational and after this litigation was initiated.  *See* Dkts. 10 and 10-1; *see also* OPM, *Privacy Impact Assessment for Government-Wide Email System (GWES)* (Feb. 28, 2025), https://perma.cc/9X8D-BWMS.  With little elaboration, Plaintiffs alleged that both PIAs were "factually inaccurate and legally inadequate."  Dkt. 14 at 9 (Am. Compl. ¶ 42).  Plaintiffs further alleged, based on then-existing reporting regarding the hasty and insecure setup and deployment of the GWES, *id.* at 7–8 (Am. Compl. ¶¶ 32–35), that the allegedly deficient PIAs have caused—

and are continuing to cause—an ongoing and "reasonably foreseeable risk that their PII will be unlawfully obtained from these unknown systems," *id.* at 11 (Am. Compl. ¶ 58).

The OPM moved to dismiss Plaintiffs' amended complaint for lack of subject-matter jurisdiction and for failure to state a claim. Dkt. 17-1 at 12–20. On December 22, 2025, the Court granted the motion, concluding that Plaintiffs' allegations, which "f[e]ll into three categories," failed to satisfy the three [indispensable] elements of standing, *Doe II*, 813 F. Supp. 3d. at 169; *see also id.* at 167–79. The Court began by explaining that "Plaintiffs allege a procedural injury—that is, they allege that [the] OPM adopted the GWES without complying with some of the procedural requirements set forth in Section 208 of the E-Government Act and the associated OMB Guidance." *Id.* at 170. The Court noted, however, that "a bare procedural violation, divorced from any concrete harm, does not satisfy the injury-in-fact requirement of Article III[.]" *Id.* (alteration omitted) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Court, accordingly, considered three possible underlying injuries that could "fill that void." *Id.*

First, the Court explained that D.C. Circuit precedent foreclosed Plaintiffs' theory of standing premised on an alleged informational injury, because that injury was not "the type of harm Congress sought to prevent by requiring disclosure" through the E-Government Act. *Id.* (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)); *see also id.* at 170–72 (discussing *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) and *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 103–04 (D.C. Cir. 2019)).

Second, the Court rejected Plaintiffs' effort to rely on an increased risk of future privacy harm to satisfy the injury-in-fact requirement. The Court acknowledged that "Plaintiffs ha[d] at

least arguably shown that the procedural requirement at issue—the preparation of an adequate PIA—is 'designed to protect a threatened concrete interest' . . . of the type at issue in this case," *id.* at 173–74 (alteration omitted) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996)), although the Court "hesitat[ed] to conclude that Plaintiffs" had satisfied even that requirement because there was no basis to conclude that Section 208 of the E-Government Act was designed to protect "the only PII that Plaintiffs identify in their Amended Complaint[,] their .gov email addresses," *id.* at 174. But most importantly, the Court went on to hold that Plaintiffs failed (1) to "connect the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of that procedural requirement" or (2) to "connect that substantive decision to their particularized injury." *Id.* at 174–75 (alterations omitted) (quoting *Growth Energy v. Env't Prot. Agency*, 5 F.4th 1, 27 (D.C. Cir. 2021)). Plaintiffs' amended complaint was far too conclusory to identify how the PIAs were deficient or "what omitted procedural step led [the] OPM to adopt the GWES by mistake." *Id.* at 175.

In addition, the amended complaint failed "to allege facts that, if accepted as true, would plausibly establish that the substantive agency action that disregarded the procedural requirement created both a *substantially* increased risk of harm and a *substantial* probability of harm with the increased risk of harm taken into account." *Id.* at 175–76 (emphases in original) (alterations omitted) (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015)). The Court, then, reviewed Plaintiffs' relevant allegations in detail, including their allegations regarding the "2014 hack of [the] OPM's server," their assumptions regarding the GWES server's lack of security, and their reliance on news articles, Reddit messages, and podcasts

regarding the GWES's questionable set up and potential vulnerabilities.  *Id.* at 176–78.  As to each set of allegations, the Court was unpersuaded that the allegations sufficed to allege an injury-in-fact under the increased-risk-of-harm test.  *Id.* at 176.

Finally, the Court rejected Plaintiffs' effort to premise their standing on "a direct interest in ensuring that [the] OPM conducts and publishes a legally sufficient PIA," because "that type of generalized interest" was nothing more than a generalized grievance about the government's compliance with the laws.  *Id.* at 178–79.

Because Plaintiffs failed to allege facts "sufficient to establish named class representatives' standing to sue," the Court also denied "Plaintiffs' motion for class certification or pre-certification discovery in the alternative, Dkt. 38, as moot."  *Id.* at 184.  The Court dismissed Plaintiffs' amended complaint without prejudice on December 22, 2025, *id.* at 185, and after providing Plaintiffs with time to seek leave to amend, the Court entered final judgment on January 15, 2026, *see* Dkt. 46.  Plaintiffs did not file a Rule 59(e) motion to alter or amend the judgment within the 28 days permitted under the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 59(e).

On February 20, 2026, Plaintiffs moved *ex parte* for an extension of time to file a notice of appeal, indicating an intent to file a motion for reconsideration and to file a second amended complaint.  *See* Dkt. 47 at 2.  The Court granted that motion.  *See* Min. Order (Feb. 24, 2026). On February 28, 2026, Plaintiffs filed the pending motion to set aside the judgment, for leave to file a second amended complaint, and to amend the Court's Memorandum Opinion to the extent that it denied Plaintiffs' motion for class certification as moot.  *See* Dkt. 49.  The OPM opposes all three forms of relief.  *See* Dkt. 50.

## II.  ANALYSIS

Rule 60(b) permits the Court to "relieve a party . . . from a final judgment" for, among other reasons, "mistake, inadvertence, surprise, or excusable neglect;" "newly discovered evidence;" "fraud . . . misrepresentation, or misconduct by an opposing party;" or "any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  Absent a showing that the judgment is void, has been satisfied, or a showing of "extraordinary circumstances," *see Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 n.11 (1988), a Rule 60(b) motion must be brought within one year of entry of the judgment, Fed. R. Civ. P. 60(c).  "The party seeking relief under Rule 60(b) bears the burden of showing that he or she is entitled to the relief," *United States v. Dynamic Visions, Inc.*, 321 F.R.D. 14, 17 (D.D.C. 2017) (citation omitted), and "the decision to grant or deny a [R]ule 60(b) motion is committed to the discretion of the [d]istrict [c]ourt," *United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469, 476 (D.C. Cir. 1993).

Here, Plaintiffs move for reconsideration pursuant to Rule 60(b)(2), Dkt. 49 at 1, which permits relief from judgment when a party raises "newly discovered evidence that, with reasonable diligence, could not have been discovered in time" of the dispositive proceeding, Fed. R. Civ. P. 60(b)(2).  "A district court considering a motion for relief from judgment under Rule 60(b) must strike a delicate balance between the sanctity of final judgments and the incessant command of a court's conscience that justice be done in light of all the facts."  *Bain v. MJJ Prods., Inc.*, 751 F.3d 642, 646 (D.C. Cir. 2014) (citation modified).  To obtain relief from a judgment on this basis, the movant bears the burden of showing that "'(1) the newly discovered evidence is of facts that existed at the time of trial or other dispositive proceeding, (2) the party seeking relief [was] justifiably ignorant of the evidence despite due diligence, (3) the evidence [is] admissible and of such importance that it probably would have changed the outcome, and

(4) the evidence [is not] merely cumulative or impeaching.'" *Lightfoot v. District of Columbia*, 555 F. Supp. 2d 61, 68 (D.D.C. 2008) (citation modified) (quoting *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001)).

Plaintiffs also move for leave to amend pursuant to Rule 15(a)(2), Dkt. 49 at 9, which permits a party to amend its pleading with leave of the Court, Fed. R. Civ. P. 15(a)(2).  Leave to amend a complaint under this provision "should freely [be] give[n] . . .  when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[O]nce a final judgment has been entered," however, "an amendment to a complaint can only be granted after the requisites of Rule 59(e) or 60(b) have been satisfied."  *Epps v. Howes*, 573 F. Supp. 2d 180, 186–87 (D.D.C. 2008) (citation modified); *see also Ciralsky v. CIA*, 355 F.3d 661, 673 (D.C. Cir. 2004) ("[O]nce a final judgment has been entered, a court cannot permit an amendment unless the plaintiff first satisfies Rule 59(e)'s more stringent standard for setting aside that judgment." (citation modified)); 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1489 (3d ed. Apr. 2026 update) ("Most courts faced with the problem have held that once a judgment is entered the filing of an amendment cannot be allowed until the judgment is set aside or vacated under Rule 59 or Rule 60." (footnote omitted)).

The Court will, accordingly, begin and end with the Rule 60(b) standard.

### A.

At the onset, the Court notes that Plaintiffs' second amended complaint includes several new allegations, some of which invoke the purportedly newly discovered evidence, and some of "which were admittedly previously known" but which Plaintiffs nonetheless urge the Court to consider holistically with the newly discovered evidence.  Dkt. 52 at 4.  Because Plaintiffs must satisfy the Rule 60(b) standard before the Court can entertain a motion for leave to amend the

complaint, and because Plaintiffs' claim for relief under Rule 60(b) is premised exclusively on newly discovered evidence, the Court will focus on that evidence alone. The Court, accordingly, turns to the question whether Plaintiffs have met their burden under Rule 60(b)(2).

Plaintiffs premise their motion to set aside the judgment on an interim report released by the minority staff of the House of Representative's Committee on Oversight and Government Reform on February 12, 2026. *See* Staff of H.R. Comm. on Oversight & Gov't Reform, 119th Cong., *How DOGE and Trump Cost Taxpayers, Federal Workers, and Public Services* (Feb. 12, 2026), https://perma.cc/Z7M3-MHCF ("DOGE Report"). The relevant portion of the report states as follows:

> Shortly after taking office, DOGE operatives at [the] OPM implemented a new system to send the "Fork in the Road" email across government. DOGE employees flouted cybersecurity, privacy, and procurement laws to stand up this capability and exposed employees across a wide variety of agencies to spear-fishing and social engineering cyberattacks.
>
> Following a request from Oversight Committee Democrats, [the] OPM's Office of the Inspector General (OIG) issued a flash report that found [the] OPM failed to perform the basic due diligence necessary to implement this system. Trump appointees at [the] OPM overrode career civil servants and ignored their warnings about security, privacy, and operations to force implementation of DOGE's goals. DOGE also sent emails to the government[-]wide email system it implemented, demanding that every employee submit "five things" they accomplish each week. The OIG's report noted that this system had no controls preventing the dissemination of classified information over this unclassified channel. DOGE staffers reportedly fed these responses into a version of Meta's *Llama 2* AI model without regard for the model's approval for use in the federal government or the potential leakage of sensitive information that might have been included in the emails. DOGE employees also reportedly stored files on a mixture of Microsoft OneDrive, servers, and email attachments without traditional access controls. [The] OPM OIG determined that Trump Administration officials bypassed good practice and may have enabled foreign entry into these servers through the implementation of DOGE's makeshift government-wide email system.
>
> Committee Democratic staff have worked with whistleblowers and ethical cybersecurity experts and identified additional concerns with DOGE's interference at [the] OPM. Experts have shown evidence raising concerns of

> potential Russian and Chinese access to OPM servers shortly after DOGE created the government-wide email infrastructure. Separately, information received by Committee Democratic staff indicated that DOGE employees lowered all firewall protections at [the] OPM to enable the exfiltration of data for use outside of a government environment. Each of these instances raises serious questions about national security as [the] OPM holds sensitive government operations data that adversarial state and non-state actors could use for leverage over federal employees or to infiltrate other government systems.

DOGE Report at 24–25 (footnotes omitted).

There is no dispute that "the newly discovered evidence is of facts that existed at the time of trial or other dispositive proceeding," *Lightfoot*, 555 F. Supp. 2d at 68 (citation modified). Instead, the parties focus on the second factor: whether Plaintiffs could have discovered the evidence contained in the DOGE Report with reasonable diligence before Plaintiff moved for reconsideration. *See* Dkt. 49 at 6 ("The most relevant question before the Court is whether Plaintiffs could have discovered this evidence with reasonable diligence earlier than [they] did."); *see also* Dkt. 50 at 12–15; Dkt. 52 at 1–3. Although that factor is not invariably dispositive, the interest in finality counsels against granting relief to a plaintiff who has failed to exercise due diligence, unless the original judgment was "manifestly unjust." *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980).

Plaintiffs contend that the evidence could not have been discovered with due diligence because the DOGE Report was released on February 12, 2026, and because they had no reason to know of or did not have access to the three principal sources (which each predate this Court's entry of final judgment) relied on by the DOGE Report. Dkt. 49 at 6–7. The OPM, on the other hand, posits that Plaintiffs could have discovered the substance of the new evidence "using the slightest of diligence on or before February 12, 2026," which was Plaintiffs' deadline to move to alter or amend the judgment pursuant to Rule 59(e). *See* Dkt. 50 at 12–13.

The OPM has the better of the arguments, as a parsing of the DOGE Report reveals. The first paragraph quoted above merely reports, in conclusory terms, what the Ranking Member of the Committee on Oversight and Government Reform wrote to the Acting Director of the OPM in February 2025. *See* DOGE Report at 24 n.93. Although the Ranking Member accused "DOGE employees" of "flout[ing] cybersecurity, privacy, and procurement laws" and of "expos[ing] employees across a wide variety of agencies to spear-fishing and social engineering cyberattacks," *id.* at 24, this paragraph includes no facts or information that might provide a factual basis to support Plaintiffs' standing.

The first half of the next paragraph refers to "a flash report" prepared by the "OPM's Office of the Inspector General," which "found [that the] OPM failed to perform the basic due diligence necessary to implement" the GWES. *Id.* Among other things, the DOGE Report notes that the Inspector General found that the "system had no controls preventing the dissemination of classified information over this unclassified channel." *Id.* Plaintiffs acknowledge that the Office of the Inspector General ("OIG") flash report was publicly available as of September 2025 but assert that they had no reason to know that an audit report from the OPM's OIG was requested or was issued. *See* Dkt. 49 at 7–8. That assertion is both unsupported and incorrect. Had Plaintiffs made any effort to look for additional support for their claim of increased-risk-of-harm standing after the Court issued its decision in December 2025, they would have found the flash report within minutes: a Google search of the key words "OPM GWES" returns the OIG flash report as the fifth search result. *See* Google, "OPM GWES," https://perma.cc/2EFC-AFNM. Plaintiffs did not need to know that the OIG was preparing a report or that it had, in fact, done so to conduct such a garden-variety search.

The next sentence in the DOGE Report claims that "DOGE staffers reportedly fed these responses into a version of Meta's *Llama 2* AI model without regard for the model's approval for use in the federal government or the potential leakage of sensitive information that might have been included in the emails." DOGE Report at 24. Here, Plaintiffs' claim of due diligence is even less well-taken. In making that allegation, the DOGE Report relied upon an article published in *Wired* in May 2025—seven months before the Court issued its decision dismissing Plaintiffs' amended complaint for lack of jurisdiction, and almost nine months before Plaintiffs' time to move to alter or amend under Rule 59 elapsed. *Id.* at 24 n.95.

Plaintiffs' delay in identifying these or similar sources is particularly unjustified in light of the fact that they were on notice that the Court was skeptical of Plaintiffs' standing to bring suit as early as when the Court denied their motion for a temporary restraining order on February 17, 2025. *Doe I*, 2025 WL 513268 at *5–7.

The otherwise previously unavailable sources referenced in the DOGE Report, such as briefing between the OIG and the Oversight Committee's staff or other communications with the Oversight Committee's staff, *see* DOGE Report at 24–25 n. 96–98, are merely "cumulative" of the other publicly available sources, *Lightfoot*, 555 F. Supp. 2d at 68 (citation modified). It is not surprising, for example, that the OIG briefing of the Oversight Committee included essentially the same information contained in the OIG flash report. *Compare* DOGE Report at 24 ("DOGE employees also reportedly stored files on a mixture of Microsoft OneDrive, servers, and email attachments without traditional access controls.") *with* U.S. Office of Pers. Mgmt. & Office of Inspector Gen., Report No. 2025-ISAG-018, *Flash Report: Audit of the U.S. Office of Personnel Management's Government-Wide Email System* 8 (Sep. 24, 2025) ("OIG Flash Report"), https://perma.cc/A92N-WGNB ("email responses, potentially containing sensitive or classified

11

information, may have been stored in multiple locations, including Microsoft Office 365 mailboxes, the GWES SME's laptop, and archived email storage.  Additionally, these email responses were shared with multiple OPM officials via Microsoft OneDrive."); *compare* DOGE Report at 24 (summarizing the OIG's "determin[ation] that Trump Administration officials bypassed good practice and may have enabled foreign entry into these servers through the implementation of DOGE's makeshift [GWES]") *with* OIG Flash Report at *i* (OIG prepared "flash report to inform stakeholders regarding [the] OPM's failure to follow information systems security best practices for the development, implementation, and maintenance of the GWES.").

The information provided by the DOGE Report is also cumulative of Plaintiffs' allegations in their now-dismissed amended complaint.  The DOGE Report states that the OPM "bypassed good practice" in implementing GWES; that "information . . . indicated that DOGE employees lowered all firewall protections at [the] OPM to enable the exfiltration of data;" that DOGE's conduct "may have enabled foreign entry into these servers;" that there was no "regard for . . . the potential leakage of sensitive information that might have been included in the emails;" and that there were "concerns of potential Russian and Chinese access to OPM servers shortly after DOGE created the government-wide email infrastructure."  DOGE Report at 24. These allegations, in substance, offer nothing different from (1) Plaintiffs' news reports, Reddit posts, and podcasts regarding how the OPM (or Elon Musk) allegedly flouted prescribed security and procurement measures in adopting and implementing the GWES, *see* Dkt. 14 at 6–8 (Am. Compl. ¶¶ 27–36); (2) Plaintiffs' allegations that the "server is not sending these or other emails securely due to [its] rapid deployment" because "[s]ecure communications take time and coordination to plan and implement," *id.* at 8 (Am. Compl. ¶ 35); and (3) Plaintiffs' speculation that "hackers affiliated with hostile foreign services . . . begin attempting to access a new U.S.

12

Government device as soon as they learn of its deployment," *id.* The DOGE Report "raise[s] [the same] reasonable questions" raised by Plaintiffs' original allegations regarding the GWES's setup. *Doe II*, 813 F. Supp. 3d at 176, 177. But it sheds no meaningful, new light on substantial future privacy vulnerabilities resulting from the GWES's continued existence (to the extent it still exists).[1] Far more is necessary to constitute newly discovered, non-cumulative evidence that justifies reopening the case at this late juncture.

The Court, accordingly, concludes that Plaintiffs have failed to meet their burden for seeking relief from final judgment under Rule 60(b)(2). Rule 60(b) protects the interest of justice by ensuring that significant, new evidence is not ignored simply because, notwithstanding the due diligence of counsel, it was not discovered until after judgment was entered. But Rule 60(b) does not permit do-overs, where counsel could have discovered the evidence at issue with a modicum of diligence and where that "evidence" is, in any event, cumulative, duplicative, or of only marginal relevance. Although the judicial interest in finality is not insurmountable, it is not as easily overcome as Plaintiffs' motion posits.

**B.**

Having concluded that Plaintiffs' motion to set aside the Court's final judgment pursuant to Rule 60(b)(2) fails, Plaintiffs' remaining requests for relief follow suit. The Court cannot grant Plaintiffs leave to file a second amended complaint in a case that is—and will remain— closed. Dkt. 49 at 9–12. Nor is there any basis for the Court to "amend its Memorandum

---

[1] Even if Plaintiffs had focused on the OIG Flash Report in a timely manner, it is far from clear that the report would have helped them allege that they face a substantially increased risk of harm—possible illicit acquisition of their .gov email addresses—due to deficiencies in the first or second PIAs. Among other things, the report notes that the OPM has decommissioned the GWES and is engaged in "close-out procedures" for the GWES. *See* OIG Flash Report at 3–4, 6–7, 9–10.

13

Opinion to the extent that it held that Plaintiffs' motion for class certification was moot." *Id*. at 12.  As the Court has previously explained, "[a]bsent allegations sufficient to establish named class representatives' standing to sue, Plaintiffs' class allegations necessarily fail as well." *Doe II*, 813 F. Supp. 3d at 184–85.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Reconsideration, Dkt. 49, is hereby **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  July 29, 2026

14